TRUCK SAFETY EQUIPMENT INSTI-
TUTE, an Illinois not-for-profit
Corporation, et al., Plaintiffs,

v.

Robert KANE, Attorney General,
Commonwealth of Pennsylvania,
et al., Defendants.

Civ. No. 75–636.

United States District Court,
M. D. Pennsylvania.

Sept. 16, 1976.

690

Lawrence F. Henneberger, William B. Sullivan, Michael M. Eaton, Robert W. Green, Arent, Fox, Kintner, Plotkin &

Kahn, Washington, D. C., G. Thomas Miller, McNees, Wallace & Nurick, Harrisburg, Pa., for plaintiffs.

Anthony J. Maiorana, Roger T. Shoop, Michael R. Deckman, Asst. Attys. Gen., Pa. Dept. of Transp., Commonwealth of Pennsylvania, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

Presently before the court are cross motions for summary judgment filed by plaintiffs and defendants in the above-captioned case in which plaintiffs seek declaratory and injunctive relief. Both motions are filed pursuant to Federal Rule of Civil Procedure 56 together with supporting affidavits [1] and relate only to Count 1 of plaintiffs' two-count complaint, concerning an issue of preemption under the Supremacy Clause of the Constitution, Article VI, Clause 2.

■ Jurisdiction in federal court in this case is predicated upon 28 U.S.C. § 1337 providing for jurisdiction in the district courts for civil actions arising under acts of Congress regulating commerce. *See, General Motors Corp. v. Volpe,* 321 F.Supp. 1112 (D.Del.1970), *modified on other grounds,* 457 F.2d 922 (3d Cir. 1972), and 28 U.S.C. § 1331 governing matters of a federal question. It has also been recently established that this court may properly consider the statutory preemption claim set forth in Count 1 and arising under the Supremacy Clause prior to convening a three-judge court under 28 U.S.C. § 2281, as it existed at the time of the filing of this suit, for the purpose of deciding the constitutional claim involving the Commerce Clause which is contained in Count 2. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

1. Plaintiffs have also submitted extensive documentation of the legislative history of the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act), 15 U.S.C. §§ 1381, et seq., as amended, which Act they contend preempts the particular provisions of the Pennsylvania

Motor Vehicle Code, 75 P.S. §§ 101, et seq., providing for the state equipment approval program, and other materials evidencing the general background and nature of the Federal regulatory program for motor vehicle equipment.

■ Moreover, in light of the fact that we are restricted to review of the preemption claim under the posture of this case, we shall not consider defendants' challenge to the validity of the motor vehicle safety standards here in question as that challenge pertains to the absence of consultation between the Secretary of Transportation and the Vehicle Equipment Safety Commission (VESC) prior to the promulgation of the standards contained in 15 U.S.C. § 1381, et seq., and as purportedly required in § 1392(f)(2), 28 U.S.C.[2]

The pertinent section of the Safety Act governing the preemptive effect of the motor vehicle safety standards issued by the Secretary under that Act is § 1392(d) of the Act which states:

> "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard."

Section 1397(b) further provides that the Federal standards are designed to apply to motor vehicles prior to and at the time of their initial sale and introduction into the market in interstate commerce; that is, to manufacturers, distributors and dealers, and that state standards are to be effective and enforced as to used motor vehicles in the possession of consumers in order to assure a continuing and effective national traffic safety program.

In light of these express terms establishing the scope and breadth of the Federal regulatory scheme of motor vehicle equipment, defendants concede that to the extent the State's standards regulating motor vehicle equipment are not identical to lawfully adopted Federal standards, they are null and void and unenforceable. Defendants maintain, however, that the State's standards in their entirety are non-identical with the corresponding Federal standards and that the State has recognized this fact and chosen to treat its own divergent standards as if they were identical to the Federal standards and to informally enforce these "conformed" standards without having actually formally enacted or issued either through the legislative branch or the administrative branch "identical" standards. While defendants represent that such identical standards are in the making and when enacted will be enforced independently of the Federal enforcement effort but with due regard to the Federal standards while the State enforcement procedures are being completed, they contend that at this time there is no viable case or controversy which could establish jurisdiction of the Federal courts. And in the event that this court does find the existence of a concrete case or controversy underlying this present action, defendants finally maintain that the State has made no effort to impose civil sanctions or otherwise enforce the State standards against plaintiffs and that, accordingly, any case or controversy is not ripe for adjudication by this court.

■ We agree that to the extent the State standards governing aspects of performance for equipment on motor vehicles are co-extensive with Federal standards and non-identical such State standards are null and void and unenforceable. In view of the comprehensive nature of the Federal and State standards encompassing nearly

---

**2.** In any event, it appears that for at least certain of the standards issued by the Secretary pursuant to the Safety Act sufficient consultation with the various enumerated interest groups was undertaken prior to the issuance of such standards. *Automotive Parts & Accessories Assn. v. Boyd,* 132 U.S.App.D.C. 200, 407 F.2d 330, 334 n. 5 (1968).

the same motor vehicle equipment and covering many of the same aspects of performance however, it would be incredible that some of the standards were not identical. In many respects, the two sets of standards do contain different criteria as well as different standards of performance for like types of equipment, but in certain areas basic types of equipment are included in both sets of standards and are subject to identical standards. For instance, as plaintiffs point out both the Federal and State standards require that certain vehicles be equipped with two red taillights mounted on the rear; two stoplights, one mounted on each side of the rear; four red reflectors, with two mounted on the rear and one mounted on each side near the rear; two amber reflectors, mounted on the sides near the front; and four signal lights, two mounted on the front and two mounted on the rear. Compare, Pennsylvania Motor Vehicle Code, 75 P.S. §§ 801(d), (e), (f); 802(c)(1) and (c)(2) with Federal Motor Vehicle Safety Standard 108, 49 C.F.R. § 571.-108, Tables I–IV. Cf. Appendix Vol. I, pp. 303, 307, 317, 347, 367, plaintiffs' motion for summary judgment. Adopting the same narrow construction of the "aspect of performance" language in the preemption section of the Act as was utilized in *Chrysler Corp. v. Tofany,* 419 F.2d 499 (2d Cir. 1969), we are nevertheless compelled to conclude that an actual case and controversy does in fact exist in this case upon which to establish jurisdiction in the Federal courts.[3]

Furthermore, defendants admittedly are informally enforcing the State standards as they exist at present while construing them so that they are in "conformity" with the Federal standards. Defendants have also indicated their intention to enact identical State standards in the future and to enforce them independently of but in conjunction with Federal enforcement procedures. While defendants contend they do not intend to prosecute under the present State

standards and that they merely seek the voluntary cooperation of manufacturers and distributors, plaintiffs remain subject to the State standards and accordingly, under these circumstances, we believe there is a ripe, justiciable controversy at hand. Cf., Appendix Vol. I, pp. 422–423, plaintiffs' motion for summary judgment.

■ Recognizing that certain factual disputes apparently are raised in the briefs and affidavits submitted by both parties in support of their respective motions for summary judgment, we conclude that these disputed facts are neither critical to nor dispositive of the preemption issue posed before the court and, accordingly, we shall reach our decision in this case without having to resolve these matters. Confining our attention to the preemption issue, therefore, we further conclude that while neither express nor clear, the nature, scope and circumstances underlying the enactment of the Safety Act and the issuance of the related Federal motor vehicle safety standards necessarily imply that such provisions were intended to preempt both the creation and the enforcement of identical standards by the state concerning motor vehicle equipment up until the time of the vehicle's first purchase.

The Federal program for enforcing the duly promulgated motor vehicle safety standards essentially consists of a self-certification process by each motor vehicle manufacturer, distributor or dealer in which they are required to certify that each vehicle or item of motor vehicle equipment subject to the standards are in compliance prior to the first purchase of the item. The Safety Act makes it unlawful to certify that an item of motor vehicle equipment conforms to an applicable Federal standard if the manufacturer in the exercise of "due care" has reason to know that such certification is false or misleading in any material respect. 15 U.S.C. § 1397(a)(1)(C). The Act

---

**3.** At the same time we frown on the possibility that defendants could avoid the effect of the preemption section by informally enforcing non-identical standards "deemed" to be in conformity with the Federal standards and essen-

tially seeking voluntary compliance and cooperation by the manufacturers of motor vehicles under the independent state enforcement procedures through alleged "threats" of actual prosecution and enforcement.

is administered by the National Highway Traffic Safety Administration (NHTSA) of the United States Department of Transportation and the Secretary is afforded broad investigative powers to aid in enforcement of the Act's provisions. 15 U.S.C. § 1401. NHTSA enforces the Act by requiring, *inter alia*, detailed recordkeeping and data submission evidencing the manufacturer's compliance with the Act and the basis for their self-certification. 15 U.S.C. §§ 1401, 1418. In addition, NHTSA conducts compliance testing of equipment with the Federal standards on a random basis and also authorizes recall campaigns where equipment is not in conformity with the Federal standards or where it contains a safety-related defect. The Safety Act provides for civil penalties, 15 U.S.C. § 1398, and the United States is also permitted to seek injunctive relief in Federal district courts to restrain violations of the Act, 15 U.S.C. § 1399.

The Pennsylvania enforcement scheme of provisions in the Vehicle Code regulating motor vehicle equipment, on the other hand, entails the "approval" of each regulated item of equipment prior to its sale or use and also requires such approval prior to the sale, use or inspection of any vehicle on which such equipment is installed. See, 75 P.S. §§ 807, 808, 812 and 819(e). Approval must be sought either through the State itself by the filing of the necessary materials, or through the American Association of Motor Vehicle Administrators (AAMVA), Pennsylvania's recognized equipment approval agent. In either event neither Pennsylvania nor the AAMVA conducts compliance tests themselves, but rather they require the submission of test reports from approved laboratories upon which each relies in establishing the manufacturer's compliance with the applicable State safety standards. The AAMVA also periodically re-tests the equipment and spot-checks the market for unapproved equipment. Whether approval is obtained through the State or through the AAMVA, however, compliance with the Federal enforcement procedure and self-certification by the manufacturer that its equipment conforms to the effec-

tive Federal standards is not sufficient in and of itself to assure compliance with the State standards and receipt of the necessary "approval" under the corresponding State enforcement program. The State Vehicle Code provides criminal sanctions for violations of the equipment approval provisions, 75 P.S. §§ 807, 808, and also restricts the titling, registration or issuance of a certificate of inspection to motor vehicles containing unapproved equipment, 75 P.S. §§ 812(c), 819(e).

In view of the comprehensive nature of the Federal standards for the quality of motor vehicle equipment prior and up to the time of the first purchase of such equipment, we are constrained to conclude that the Pennsylvania motor vehicle equipment approval program is preempted by the Safety Act of 1966 to the extent the State program reaches federally-regulated equipment. Defendants appear to acknowledge that the preemption section contained in 15 U.S.C. § 1392(d) preempts and precludes any State standards which are "not identical" to corresponding Federal standards. The thrust of their primary argument in opposition to complete preemption is, however, that by virtue of the fact the states were enabled to retain "identical" standards it must necessarily follow that Congress intended that the states be allowed to observe different *enforcement* procedures, pre-sale and post-sale, provided that manufacturers be allowed to market their equipment where they have obtained compliance with the Federal procedures and are awaiting pending state "approval". In support of this argument, defendants emphasize that the primary purpose of the Safety Act as expressly set forth in 15 U.S.C. § 1381 is the reduction of "traffic accidents and deaths and injuries to persons resulting from traffic accidents" and not the countervailing policy of uniformity in enforcement. Defendants stress the experience and expertise which the various states have acquired in regulating motor vehicle equipment and contend that their diverse enforcement practices would supplement and enhance the Federal enforcement effort in

an otherwise burdensome task on a national scale; independent state enforcement procedures are deemed to be encouraged by the Act in order to advance the uniform Federal standard and the policy of less traffic accidents at the expense of uniform regulation, which is considered only a secondary consideration underlying the standards.

Assuming, *arguendo,* that the intent of Congress as evidenced by § 1392(d) and the legislative history of the Act was to establish a uniform national standard which was to be implemented and enforced pre-sale not only by the NHTSA but by independent enforcement programs of the states as well according to their particularized customs and means, we do not believe that this scheme could be effectuated without necessarily resulting in either pointless duplicative efforts on the part of the states or, in the alternative, the institution of a different, "non-identical" standard by the states. To afford the states the authority to enact enforcement programs which are compatible but not necessarily identical to the Federal enforcement scheme in order to account for Congress' implied permission to the states to adopt "identical" standards appears to mask a distinction without a difference; where motor vehicle equipment is ultimately subject to the same identical standard whether scrutinized under both a state and a Federal enforcement scheme or solely under the Federal scheme, it does not appear that a separate state enforcement program, pre-sale, could be of benefit or legitimatized in any way.

█ For instance, in the situation where a manufacturer has properly self-certified compliance with the Federal standards under the Federal enforcement procedure and is marketing the product while awaiting approval by the state on a pending application, can the state do otherwise than grant the approval without necessarily establishing or invoking a different "standard" by reason of its different enforcement procedure and thereby rendering the Federal enforcement procedure a nullity? Congress intended a uniform minimum national standard for specified aspects of motor vehicle equipment performance which would ensure that the vehicle would be admitted for market in all states, and it provided a comprehensive enforcement system under which all manufacturers, distributors and dealers are to certify compliance with this standard. Cf., Appendix Vol. II, pp. 786, 664, plaintiffs' motion for summary judgment. Under these circumstances, to allow a state's enforcement procedures to be more strict than the Federal enforcement scheme must do injustice to a uniform and identical Federal standard.

█ We believe that the language of § 1392(d) by its express terms cannot be construed to have a pre-emptive effect within the meaning of the Supremacy Clause, but in light of the fact that a uniform Federal standard pre-sale can only be maintained if identical enforcement procedures are employed, and adoption of such procedures would merely constitute a duplicative effort, we are constrained to conclude that preemption is implicit in the enactment of the Safety Act and the promulgation of extensive pre-sale motor vehicle equipment safety standards. Under the test enunciated in *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941) for determining when Federal preemption is necessary and justified,[4] it is

---

4. In *Florida Lime & Avocado Growers v. Paul,* 373 U.S., at 141–44, 83 S.Ct., at 1216–18, 10 L.Ed.2d, at 256–57, the Supreme Court stated: "Whether a State may constitutionally reject commodities which a federal authority has certified to be marketable depends upon whether the state regulation 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404,

85 L.Ed. 581. . . . The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

"The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of

evident that both the state and the Federal enforcement procedures cannot be executed pre-sale without creating doubts and confusion as to the applicable and required standard and thereby impairing the effectiveness of the Federal standard and the Federal method of enforcement, and frustrating the accomplishment of the Safety Act's full purposes and objectives. Cf., *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961).

■ The Federal enforcement scheme relies on a self-certification process, and because of the comprehensive nature and national application of the Federal standards the NHTSA is understandably unable to conduct actual tests on each item of equipment and verify its compliance with the Federal standards prior to its entrance into the market for sale. Clearly there is room for additional, stricter enforcement on a more localized basis and this we believe was the role intended by Congress to be given to the states—as to post-sale enforcement of the Federal standards during use of the equipment by the consumer.[5] Congress' desire to involve the states in a consultative role during the formulation of the individual Federal standards, its express delegation to the states of the function of inspecting used motor vehicles; that is, motor vehicles after the first purchase, and its implied intention of allowing the states to have "identical" standards to the Federal standards can all be understood and given harmonious, coherent meaning if it is recognized that the Federal standard was intended to be enforced by the Federal authorities at the manufacturer, distributor and dealer's level and by the states in a complimentary fashion on a post-sale basis in order to assure a continuing and effective national traffic safety program. Cf., Appendix Vol.

II, p. 664, plaintiffs' motion for summary judgment. Moreover, it would appear that the Federal scheme entailing self-certification would be more proper and suitable at the manufacturing and distributing level which is more of a national character and scope and encompasses manufacturers and distributors dealing in a large volume of goods and engaged in interstate commerce, while regulation of motor vehicle equipment at the consumer level would be particularly conducive to localized state enforcement. Cf., Appendix Vol. II, pp. 624–625, plaintiffs' motion for summary judgment.

■ Furthermore, the Safety Act expressly reserves common law liabilities, warranty obligations and consumer remedies in 15 U.S.C. §§ 1397(c) and 1420, not as further evidence of the states' role in presale *regulation* of motor vehicle equipment but rather as an indication that compliance with the Federal standards is no guarantee that safety-related or other defects do not exist in the equipment and to avoid foreclosure of remedies where defects do in fact exist.

Finally, defendants contend that this court should accord great weight to prior administrative constructions of the presumption section provided in the Safety Act in discerning the intent of Congress in adopting the language used in that section as finally enacted. Defendants particularly rely on an interpretation of the limits of state enforcement procedures prepared by Douglas W. Toms, Acting Administrator for the NHTSA, on May 13, 1971, and published in the Federal Register, Vol. 36, No. 106, June 2, 1971. In that opinion Mr. Toms states, in part, as follows:

"Although this section [1392(d)] makes it clear that state standards must be 'identical' to the Federal standards to the extent of the latter's coverage, the proce-

---

state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." (Citation omitted)

5. The states have also been afforded, however, the role of enforcing the Federal standards in

new equipment items by reason of the "approved" aspect of their program and the states' ability to act swiftly in cases where the new equipment poses an actual and immediate danger to the public. *Chrysler Corp. v. Tofany,* 419 F.2d 499 (2d Cir. 1969).

dural relationship between State and Federal enforcement of the standards is not explicitly stated in the Act. It has been the position of this agency that the Act permits the States to enforce the standards, independently of the Federal enforcement effort, since otherwise there would have been no reason for the act to allow the states to have even 'identical' standards. . . . [A] State requirement of obtaining prior approval before a product may be sold conflicts with the Federal regulatory scheme [in that there is a difference in the lead time between the state's approval process and the Federal method of self-certification]."

Relying on a statement offered by Senator Magnuson that the bill was designed to set a minimum standard which if complied with should enable the vehicle or equipment to be admitted to all states, Mr. Toms concluded that states could continue with independent enforcement procedures *provided that* manufacturers were allowed to market their products conforming to the Federal scheme while the state procedures were completed.

A similar position had been reached by a predecessor of Mr. Toms on June 5, 1968. In a letter written in response to an inquiry by the Superintendent of the Illinois State Highway Police, Doctor William Haddon stated that "where State standards are validly in effect, Federal law does not exclude or restrict their enforcement either in regard to new (pre-sale) or used vehicles." At the same time, however, Doctor Haddon expressed uncertainty as to how and to what extent state standards covering the same vehicle or aspect of performance must conform to Federal standards and concluded that this decision must be reached as to each standard and its specific provisions.[6]

■ While the interpretation of the preemption issue which was offered by Mr. Toms purports on one hand to follow the concept advanced by Senator Magnuson to the effect that a uniform minimum standard was to be observed which would assure vehicles in compliance would be admitted to all states, on the other hand it further reasons that once admitted to the state under the Federal enforcement scheme it may thereafter be prohibited under the state's method of enforcement for the same Federal standard. Clearly this is an unreasonable interpretation, particularly in light of the alternative construction voiced by plaintiffs, and runs contrary to the previous discussion concerning concurrent state and Federal enforcement procedures and the improbable maintenance of a uniform set of Federal standards. Furthermore, the alternative explanation for Congress' decision to allow the states to retain "identical" standards; that is, that the "identical state standards were intended to be implemented and enforced on a post-sale basis, comports with the overall enforcement structure established by the Safety Act and undermines the main premise of Mr. Toms' opinion that separate methods of enforcement were intended.

■ Accordingly, it is the conclusion of this court that the Safety Act of 1966, within the meaning of § 103(d) of the Act, 15 U.S.C. § 1392(d), completely preempts both Pennsylvania standards to the extent that they cover the same aspect of performance and are non-identical, and any state method of enforcement of identical standards on vehicles or vehicle equipment prior to the first purchase. We reach this decision based on our conclusion as to the intent of Congress in enacting the Act, as gleaned

6. Plaintiffs maintain that Doctor Haddon's views represent the most extreme position taken by the NHTSA in advocating no preemption. Plaintiffs deem the subsequent interpretation issued by Mr. Toms to be a softening of that position in that it recognizes preemption to the extent that the state approval programs preclude the marketing of products which have conformed to federal enforcement procedures but are awaiting state approval. Plaintiffs also contend that a more recent opinion of the Chief Administrator of NHTSA in 1973, Doctor James B. Gregory, evidences a further retreat from the original position of the agency and indicates their intention to withhold interpretations of the preemptive effect of the act until the issue has been decided by the courts. To the court's knowledge, however, documents containing this opinion by Doctor Gregory have not been provided to this court.

from the specific provisions of the Act and from its legislative history. If Congress has in fact intended otherwise, then it is the responsibility and obligation of Congress to expressly and clearly state its intentions and conform the state of the law as it exists following these recent judicial decisions to such intentions.

Having decided in favor of the affirmative on the preemption claim forwarded by plaintiffs, our decision is dispositive as to both Counts I and II of plaintiffs' complaint without the necessity of convening a three-judge court to hear the Commerce Clause claim contained in Count II. Plaintiffs' motion for summary judgment will be granted.

An appropriate order will be entered.