TRUCK SAFETY EQUIPMENT INSTI-
TUTE, an Illinois not-for-profit Corpo-
ration, Abex Corporation, Signal-Stat
Division, a Delaware Corporation, R. E.
Dietz Company, a New York Corpora-
tion, Grote Manufacturing Company, a
Kentucky Corporation, Plaintiffs,

v.

Robert KANE, Attorney General, Com-
monwealth of Pennsylvania, James B.
Wilson, Secretary, Pennsylvania Depart-
ment of Transportation, Seymore G.
Heyison, Director, Bureau of Traffic
Safety, Pennsylvania Department of
Transportation, Ward B. Baumbach,
Chief, Inspection Division, Bureau of
Traffic Safety, Pennsylvania Depart-
ment of Transportation, Caroline Gard-
ner, Supervisor, Automotive Equipment
Section, Bureau of Traffic Safety, Penn-
sylvania Department of Transportation,
individually and in their official capaci-
ties, Defendants.

Civ. No. 75–636.

United States District Court,
M. D. Pennsylvania.

Feb. 26, 1979.

McNees, Wallace & Nurick by G. Thomas Miller, Harrisburg, Pa., Arent, Fox, Kintner, Plotkin & Kahn by Lawrence F. Henneberger, William B. Sullivan, Michael M. Eaton, Robert W. Green, Washington, D.C., for plaintiffs.

Michael R. Deckman, Asst. Atty. Gen., Robert W. Cunliffe, Deputy Atty. Gen., Robert P. Kane, Atty. Gen., Michael R. Deckman, Asst. Atty. Gen., Com. of Pa., Dept. of Transp., Harrisburg, Pa., for defendants.

## OPINION

HERMAN, District Judge.

In 1975 Truck Safety Equipment Institute, a trade association for manufacturers of lighting equipment and three manufacturers of such lighting equipment instituted this action challenging the enforcement of Pennsylvania's program for approval of certain types of lighting equipment regulated by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 et seq.

At that time, on summary judgment motions, we entered a declaratory judgment in favor of the Plaintiffs, holding that the enforcement by Pennsylvania of the identical standards regulated by the National Traffic and Motor Vehicle Safety Act (hereinafter the "National Safety Act") was preempted by the said Act pursuant to the Supremacy Clause of the United States Constitution (Article VI, cl. 2).[1]

The Pennsylvania Law with which this Court was concerned at that time[2] was repealed, the new law to become effective July 1, 1977. On appeal from this Court's

1. Opinion of this Court reported in 419 F.Supp. at 688.

2. Pennsylvania Vehicle Code, Title 75 (Pa.Stat. Ann. Purdon 1971) (hereinafter called "1959 Vehicle Code"). Repealed by P.L. 162, Act No. 81, June 17, 1976 (hereinafter the "New Vehicle Code") (75 Pa.Stat.Ann. §§ 1954, 4103 through 4108).

decision the United States Court of Appeals for this Circuit vacated and remanded the case for further consideration in the light of the New Vehicle Code which had not been in effect when our judgment was entered.

After a supplemental complaint and answer were filed the parties agreed upon a detailed statement of facts and thereafter both Plaintiffs and Defendants again sought summary judgment on the preemption claim set forth in Count I of the complaint.[3]

The agreed statement of facts sets forth in some detail the new provisions of the law that are attacked and the regulations that were promulgated pursuant to the new state law as well as the regulations covering the same lighting equipment in effect under the National Safety Act.

Plaintiffs again seek a declaratory judgment that under the New Vehicle Code and regulations, Pennsylvania's program for approval of federally regulated items of the subject motor vehicle lighting equipment is preempted by the National Safety Act and is therefore invalid and unenforceable. Plaintiffs further seek to enjoin the Defendants from taking any actions to implement the State's equipment approval program. Defendants ask that we declare the Pennsylvania Law not preempted.

The stipulated facts reveal that the National Safety Act, 15 U.S.C. § 1381 et seq., became law on September 9, 1966 because among other reasons of the need to establish and insure compliance with uniform national safety standards for motor vehicles and motor vehicle equipment in interstate commerce.[4] With the passage of this Act Congress created a comprehensive federal motor vehicle safety program which involves promulgation of detailed performance standards for certain items of motor vehicle equipment and self-certification by manufacturers that their equipment conforms to these standards.

The National Safety Act makes it unlawful to sell or offer to sell in interstate commerce any new item of motor vehicle equipment which is covered by a federal motor vehicle safety standard (FMVSS) unless it conforms to the applicable standard and the manufacturer or distributor so certifies. The Act provides penalties up to $800,000 for violations of the Act and injunctive relief. Both manufacturers and distributors are subject to the statutory repurchase and replacement of items of equipment which are found to contain safety defects or are otherwise not in conformity with the applicable FMVSS. Manufacturers are also required to give detailed notice, repair, replace and refund money for nonconforming equipment. The federal enforcement of motor vehicle safety standards is directed only to manufacturers and distributors and not to the purchaser. 15 U.S.C. § 1397(b)(1).

The National Safety Act is administered by the National Highway Traffic Safety Administration ("NHTSA") of the United States Department of Transportation. The Secretary of the Department is given broad investigative powers under the Act to aid in the enforcement of its provisions as well as the power to establish appropriate Federal standards. Detailed record keeping and data submission requirements are imposed upon manufacturers. The operation of NHTSA in the enforcement of safety standards is a multi-million dollar operation. FMVSS compliance tests are made by many laboratories approved by and operating for NHTSA.

Lighting equipment has been tested for compliance with FMVSS 108 every year since 1968. From 1968 until October 1977, 2,681 separate lighting devices were compliance-tested by NHTSA, 714 of which were

---

**3.** Count II of the complaint avers that the sections of the New Vehicle Code (§§ 1954, 4103 through 4108) objected to, insofar as they relate to items of federally regulated motor vehicle equipment, create an undue restraint on commerce, in conflict with the Commerce Clause, Article I, Section 8, Clause 3 of the United States Constitution. We do not reach the Commerce Clause contention at this time.

**4.** The basic purpose of the Act as later herein quoted was to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. 15 U.S.C. § 1381.

tested during the first 10 months of 1977. All of the Plaintiff manufacturers have had their lighting equipment purchased and tested by NHTSA. Additionally, each year NHTSA makes hundreds of formal requests that manufacturers furnish performance and other data to establish the basis for their self-certification of compliance with the appropriate FMVSS. When non-compliance is discovered, corrective action is sought and if not resolved by the manufacturer the matter is reported to the Attorney General for appropriate action.

Statutory penalties in over a million dollars have been collected from manufacturers.

NHTSA also conducts recall campaigns covering both nonconformance with FMVSS and safety-related defects. Over 12 million vehicles were recalled in 1977 and some two and one-half million equipment items have been recalled over the years.

Standards Nos. 108 and 125 apply to lighting equipment sold by the Plaintiff manufacturers. Standard No. 108 specifies among other things the requirements for original and replacement lamps for automobiles, and Standard No. 125 pertains to reflective triangles or warning devices without self-contained energy sources.

The federal standards are periodically reviewed and amended, No. 108 for example has been amended many times.

These facts have been set down in some detail to indicate the comprehensive nature and the pervasiveness of the federal scheme.

Under this federal regulatory scheme, NHTSA does not *approve*[5] vehicles or equipment as complying with safety standards; instead, manufacturers certify that their products comply. The manufacturer is not required to pay government fees, submit samples or laboratory test reports or obtain product approval from states or their agents.

The National Safety Act provides that where a federal motor vehicle safety standard is in effect every state standard is preempted unless it is identical to the federal one; and while the extent to which states may *enforce* identical standards is not *expressly* covered by the Act it appears to us to be evident from the language Congress used, the pervasiveness of the Act and the legislative history that the type of enforcement attempted by Pennsylvania here cannot stand.

With this explanation of the federal regulatory scheme, we turn now to the stipulated facts concerning the New Vehicle Code and the regulations promulgated thereunder.

The Pennsylvania law and regulations establishing identical standards, 75 Pa.C.S.A. § 4101 et seq. and 67 Pa. Code Ch. 410 now require that items of vehicle safety equipment be "submitted for approval" as a condition precedent to the lawful sale of such equipment in the Commonwealth.[6] Many of these items of equipment which are subject to Pennsylvania approval are also regulated by the FMVSS and are manufactured by the Plaintiff manufacturers.

If such items of equipment are not *submitted* for approval or submitted and subsequently disapproved by the Commonwealth the sale of such items (or of the vehicle to which the item is attached) in the Commonwealth even though they comply with the applicable federal standards and are so certified by the manufacturer cannot be lawfully sold or offered for sale here, and it is unlawful to operate a vehicle equipped with such equipment.

If state approval is denied for any reason, even though the item of equipment has been certified as meeting all federal standards, the manufacturer must "assure" that

---

5. Emphasis ours unless otherwise noted.

6. The Pennsylvania enforcement scheme under the 1959 Vehicle Code (now repealed as far as this matter is concerned), see 75 P.S. §§ 807, 808, 812 and 819, required "approval" and not merely the "submission for approval" before

the equipment could be legally sold in Pennsylvania. The Defendants' position is that this change cures the preemption problem we found in our earlier consideration of this case. We cannot agree.

such item of equipment is not offered for sale in the Commonwealth and must obtain from the wholesalers and dealers all unsold inventory of the item which had been distributed after approval was sought and before it was denied. After state approval is granted, it may be revoked and an injunction against its sale in Pennsylvania may be sought.

Approval may be sought from the American Association of Motor Vehicle Administrators ("AAMVA") a voluntary association of state officials, of which Pennsylvania is a member and which is Pennsylvania's approval agent, or from the Department of Transportation directly. In either event fees must be paid by the manufacturer for testing and approval of the equipment. AAMVA also requires reapproval of lighting equipment every five years with the submission of a new laboratory test report and the payment of another fee.

Although both AAMVA and the Commonwealth through the Secretary of Transportation require the testing of equipment for compliance with safety standards neither entity has ever had any testing facilities.

A test report to satisfy AAMVA must come from a laboratory approved by AAMVA or from a manufacturer's laboratory providing it meets certain qualifications, all at additional expense to the manufacturer.

Apart from the testing and retesting, AAMVA conducts on a random basis a check on the market of safety equipment for approval status. Unapproved means only that AAMVA has not been paid a fee or been furnished photographs or a test report from an approved laboratory and not that it is unsafe or not certified under the National Safety Act. AAMVA maintains a list of unapproved items which is not always current.

When a manufacturer elects to seek approval from the Pennsylvania Department of Transportation ("PennDot") he must submit an application, a copy of a labora-

ry test report prepared by a laboratory approved either by AAMVA or PennDot, a sample of the item or a photograph of it and pay a fee ranging from $25 to $100.

If in the course of its required market surveillance program it is revealed that an item of equipment which is certified as being in compliance with applicable FMVSS, but which has not been submitted for approval or which has been disapproved by PennDot the New Vehicle Code (75 Pa.C. S.A. § 4106(c)) directs that written notice of such unapproved status be given to the dealer, distributor, wholesaler or manufacturer and the dealer thereafter shall not sell the equipment and the distributor, wholesaler or manufacturer shall recall all of the equipment from all dealers. This is so even though the item is in compliance with all requirements of federal law.

A good portion of the Plaintiff manufacturers' sales of automobile headlamps, stoplamps, turn signals, etc., all regulated by the National Safety Act, are for use in Pennsylvania and must satisfy Pennsylvania's approval requirements.[7]

The New Vehicle Code contains a number of sections to force the compliance with the Commonwealth's approval requirements, including the prohibition against registration or reregistration of vehicles on which equipment has not been submitted for approval and the prohibition against the driving of such vehicle.

The stipulated facts disclose that to comply with the Pennsylvania approval program would cost the Plaintiffs substantial amounts of money. For example, Dietz paid to AAMVA from 1970 through 1974, $19,000 approval and reapproval fees and Grote paid $22,900 fees during the same period. These two Plaintiffs together during this period were obliged to spend more than $120,000 for the required laboratory test reports to be filed with AAMVA before approval could be granted. Additionally, there are administrative expenses the manufacturers are obliged to incur in preparing and filing forms and in some cases great

---

7. The Commonwealth of Pennsylvania has agreed not to enforce its law and regulations against these Plaintiffs pending the outcome of these proceedings.

expense to supply samples to the laboratories.

Manufacturers are delayed sometimes for months in placing their already federally certified items of safety equipment on the market in Pennsylvania because of the Pennsylvania approval program. In some instances approval is held up because of a dispute over the proper filing fee; whether approval is required for a previously approved item that has been changed in an apparently insignificant way or over a question of what parts of lighting equipment require approval.

With that recital of the pertinent facts we turn now to the legal issues.

■ It is appropriate to consider this preemptive matter on motions for summary judgment since the material facts have all been stipulated. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978).

As far as we can determine none of the cases dealing with the question of preemption under the National Safety Act dealt with the problem of the *enforcement* by the states of standards *identical* with those promulgated under the National Act. *See Chrysler v. Rhodes*, 416 F.2d 319 (1st Cir. 1969); *Chrysler Corp. v. Malloy*, 294 F.Supp. 524 (D.Vt.1968) rev'd sub nom. *Chrysler Corp. v. Tofany*, 419 F.2d 499 (2d Cir. 1969) which generally deal with regulations by the states of state standards not *clearly* governed by the Federal standards.

■ The Commonwealth's regulations concerning safety on the highway pursuant to the Motor Vehicle Code have their basis in the police power and it is well-settled that where a state's police power is involved, preemption will not be presumed, *Chrysler Corp. v. Rhodes, supra* n. 8; *Chrysler Corp. v. Tofany* at 511; *Locomotive Engineers v. Chicago R.I. & P.R. Co.*, 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966).

The Commonwealth maintains that where, as here, the state standards are identical to those of the federal government the state may "complement" the federal *enforcement* of such standards and that such

enforcement would not in any way interfere with the federal regulations. We are constrained to conclude otherwise.

It is not contended that the federal government cannot regulate in this area. It must be conceded that the field of highway safety in interstate commerce is particularly susceptible to Congressional control. The declaration of purpose of the Act discloses that:

" . . . the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce; to undertake and support necessary safety research and development; . . . ." 15 U.S.C. § 1381.

The question is whether or not Congress has, by this Act, excluded the states from the type of enforcement the Commonwealth here is attempting to exert.

There are certain tests established by case law to determine when Congress has in fact preempted a field.

Basically it was held in *Florida Lime and Avocado Growers Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 at 257 (1963) that preemption *must* be found where it is impossible for both federal and state regulations to exist, a situation not present in the instant case. But the Supreme Court said in passing that it is not important whether the state and federal regulations were aimed at similar or different objectives, the test "is whether both regulations can be *enforced without impairing the federal superintendence of the field*".

We next consider the statute. Congress has said (15 U.S.C. § 1392[d]) in part:

"(d) Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to

the same aspect of performance of such vehicle or item of equipment *which is not identical* to the Federal standard."

but has said nothing further on preemption, so if we are to find preemption where the standards are identical we must look elsewhere.

■ While it is true that Congress may manifest its intent to displace the states from a field by specifically saying so in the Act, it is equally true that such intent may be manifested by Congress in ways other than by specific language.

■ As Judge Matthes, Chief Judge of the United States Court of Appeals for the Eighth Circuit has so cogently said in *Northern States Power Company v. State of Minnesota,* 447 F.2d 1143 (1971) at 1146, 1147:

" . . . even where Congress has not expressly prohibited dual regulation nor unequivocally declared its exclusionary exercise of authority over a particular subject matter federal pre-emption may be implied. (authorities omitted) Key factors in the determination of whether Congress has, by implication, pre-empted a particular area so as to preclude state attempts at dual regulation include, inter alia: (1) the aim and intent of Congress as revealed by the statute itself and its legislative history, *Florida Lime & Avocado Growers, Inc. v. Paul,* supra, 373 U.S. at 147–150, 83 S.Ct. 1210: *Campbell v. Hussey,* supra, 368 U.S. [297] at 301–302, 82 S.Ct. 327 [7 L.Ed.2d 299]; (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency, *Pennsylvania v. Nelson,* 350 U.S. 497, 502–504, 76 S.Ct. 477, 100 L.Ed. 640 (1956); *Rice v. Santa Fe Elevator Corp.,* supra, 331 U.S. [218] at 230, 67 S.Ct. 1146 [91 L.Ed. 1447]; *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* supra, 330 U.S. [767] at 774, 67 S.Ct. 1026 [91 L.Ed. 1234]; (3) the nature of the subject matter regulated and whether it is one which demands 'exclusive federal regulation in order to achieve uniformity vital to national interests.' *Florida Lime & Avocado Growers, Inc. v. Paul,* supra, 373 U.S. at 143–144, 83 S.Ct. at 1218; *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 241–244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Guss v. Utah Labor Relations Board,* 353 U.S. 1, 10–11, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957); *Morgan v. Virginia,* 328 U.S. 373, 377, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946); and ultimately (4) 'whether, under the circumstances of [a] particular case [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See also *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 344, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *Nash v. Florida Industrial Comm'n.,* 389 U.S. 235, 240, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967); *Hill v. Florida ex rel. Watson,* 325 U.S. 538, 542, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); *Savage v. Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912)."

While it must be conceded that there is no physical impossibility of dual compliance with the manner in which both state and federal government enforce the same standard there can be no doubt that the enforcement planned by the state under the New Vehicle Code and regulation is much more stringent and expensive to the manufacture than is the federal enforcement and while we do not reach the Commerce question (See footnote 2) it seems apparent to me that such enforcement may very well be burdensome on interstate commerce given the nationwide sale of motor vehicles on which the lighting equipment with which we are here concerned is attached.

■ The National Traffic and Motor Vehicle Safety Act of 1966 as was shown by the stipulated facts is a most detailed and pervasive regulatory scheme designed to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents throughout the United States by the requirement of *uniform national standards.*

Detailed performance standards have been promulgated; specific self-certification was established. A National Highway Traffic Safety Administration was set up within the Department of Transportation to administer the Act. The Secretary of the Department was given broad powers in adopting the standards, investigating violations and enforcing the provisions of the Act. This multimillion dollar operation conducts compliance tests throughout the country imposing statutory penalties in the millions of dollars. Thus the very nature of the Act, applying as it does in the 50 states uniformly, and in such detail, plus the specific language of § 1397(b)(1) limiting the Federal regulations to the first sale, is some indication to me that Congressional intent was to preempt the field at the manufacturing levels leaving to the states the regulation of the identical standards at the consumer level by the regular periodic inspections.

In *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) the Court was dealing with a state highway safety statute under which the state was attempting to prohibit a bankrupt driver from retaining his license until an outstanding automobile accident judgment was satisfied, even though the driver had been declared a bankrupt under the federal bankruptcy statutes. There, in spite of the fact that the state was proceeding under its police power in the field of highway safety and that the Bankruptcy Act did not specifically preempt the field the Court found preemption on the ground that to fail to do so would frustrate Congressional intent. In *Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547, 553 an express preemption provision in the Senate-passed version of a federal noise control statute had on final passage been deleted by Congress but the Court found preemption in the pervasive nature of the federal regulatory scheme in spite of the fact that the control of noise was a well recognized part of the police power of the states and in spite of the fact that the express preemption provision had been deleted on final passage.

In this circuit in a case originating in this district the Court of Appeals in 1976 in *National Association of Regulatory Utility Commissioners v. Colemen*, 542 F.2d 11, had before it a question of accident reporting by railroads. The federal regulations set out the requirements for reporting to the federal government and the states sought to require *additional* reporting and argued that there should be concurrent reporting in the interest of safety to the traveling public. Congress had declared that "standards relating to railroad safety shall be nationally uniform to the extent practicable" 542 F.2d at 13. The declared purpose of the Act, however, was "to promote safety in all areas of railroad operations". The Court of Appeals found that the states were preempted totally in this field relying in part on the fact that if this were not so the railroads could be subject to different enforcement requirements in 50 different states. This same thing could be said of the Plaintiffs in the instant case.

In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) one of the most recent cases in this field, the Ports and Waterways Safety Act of 1972 (hereinafter P.W.S.A.) (33 U.S.C. §§ 1221 et seq. and 46 U.S.C. §§ 391(a) et seq.) controlled in major respects navigation on Puget Sound in the State of Washington. It also subjected to federal rule the design and operating characteristics of oil tankers.

The State of Washington then in 1975 adopted the Tanker Law which would regulate in particular respects the design, size and movement of oil tankers in Puget Sound.

The question arose as to whether or not the federal law preempted the Washington law. The Court held as far as pertinent here that it did so preempt under the supremacy clause of the Constitution, Article VI, Clause 2, even though there was no explicit preemption provision in the Act.

In finding preemption the Court pointed out the pervasiveness of the P.W.S.A.; that the state law stood as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress; that the statutory pattern shows that Congress "has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States. *This indicates to us that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements.*" 435 U.S. at 163, 98 S.Ct. at 997, 55 L.Ed.2d 192.

The Court further pointed out that Congress surely did not anticipate that when a vessel was found to be in compliance with the federal law that it could nevertheless be barred by state law from operating in the navigable waters of the United States and at page 193 found that "Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers."

The *Atlantic Richfield* case having many facts similar to those in the instant case is persuasive to us here.

Our conclusion is supported, we believe, by the legislative history of the National Safety Act.

The hearings of the Committee on Interstate and Foreign Commerce of the House of Representatives in 1966 on the House Bill in the "Findings and Statement of Purpose" states in part that the purpose to improve traffic safety shall be achieved "through a *national program* for traffic safety. . . ."

The report of the Senate Committee on Commerce at page 1 states that this bill is to provide "a coordinated national safety program and the establishment of safety standards for motor vehicles in interstate commerce . . . " and at page 12 under the heading, "Effect on State Law" it is said that the safety standards should be uniform throughout the country and that the "States should be free to adopt standards identical to the Federal standards,

which apply only to the first sale of a new vehicle, so that the States may play a significant role in the vehicle safety field by applying and enforcing standards over the life of the car."

The report of the Committee on Interstate and Foreign Commerce of the House of Representatives also at page 1 states that the House Bill's purpose is "to provide for a coordinated national safety program and the establishment of safety standards. . . . "

In the Conference Report on the National Safety Act, Senator Magnuson, the Manager of the Bill in the Senate had this to say, page 14230 of the Congressional Record-Senate, June 24, 1966: "Some States have more stringent laws than others but concerning the car itself[8] we must have uniformity. That is why the bill suggests to States that if we set minimum standards, a car complying with such standards *should be admitted to all states.*"

Throughout the legislative history the emphasis on the first sales of the equipment is the federal standards, reserving to the states the enforcement of the identical standards *after* the first sale.

It seems to me that the only logical conclusion we can reach is that the Pennsylvania Law and Regulations as far as they apply to this case are preempted from enforcement at the manufacturer, distributor, dealer level.

■ Defendants argue that the state may complement Federal enforcement of the standards without in any way interfering with the Federal detailed scheme and further that the plaintiff manufacturers, their distributors and dealers are not handicapped by being obliged to comply with both the Federal and State enforcement of the same standard because the equipment no longer needs to be "approved" before sale in Pennsylvania but merely "submitted for approval". We have found that the National Safety Act preempts at the first sale level the action contemplated here by the Commonwealth and while "submitted

---

8. I assume this to be equally true of lighting equipment for use on the car.

for approval" would seem at first blush to be so innocuous as to be barely noticeable, that is not really the case. Even an innocent or inadvertent failure to submit for approval as well as disapproval or revocation of approval can subject the manufacturer, distributor or dealer to civil penalties, including penalties up to $10,000 and injunction against continued sale of the equipment.

In remanding the case to this Court, the Court of Appeals suggested that a new record might reveal more substantial burdens on the Plaintiffs than did the earlier law and that we then would want to determine whether or not the Pennsylvania program unconstitutionally burdened the Plaintiffs and was thereby preempted. The stipulated facts and the agreement of the parties when filing the motion for summary judgment presented us with the question of whether on Count I of the complaint Pennsylvania's motor vehicle equipment approval program is preempted by the National Traffic and Motor Vehicle Safety Act to the extent that it reaches federally-regulated equipment, leaving Count II, the averment that the Pennsylvania program created an undue restraint on interstate commerce in conflict with the Commerce Clause Article I, Section 8, Clause 3 of the United States Constitution for later determination if necessary.

As we earlier indicated in this Opinion, the Pennsylvania program as it relates to these Plaintiffs is such a burden that it well may inordinately delay the production and distribution of improved safety equipment which would tend to stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, (*Hines v. Davidowitz*, supra) still further reason why in this case the Pennsylvania plan should be preempted by federal law.

We conclude that in the light of what we have here said the National Safety Act of 1966, particularly section 103 (15 U.S.C. § 1392(d)) completely preempts the Pennsylvania standards to the extent that they cover the same aspect of performance and are not identical to the federal standards;

and also preempts any state method of enforcement of identical standards prior to the first purchase.

Accordingly, we will deny the Defendant's motion for summary judgment and grant the motion of the Plaintiffs entering a summary judgment against the Defendants declaring that Pennsylvania's motor vehicle equipment approval program is preempted by the National Traffic and Motor Vehicle Safety Act to the extent that it reaches federally-regulated equipment.