804 F.2d 1408
 25 ERC 1337, 55 USLW 2370, 17 Envtl.
L. Rep. 20,507
 DIRECT AUTOMOBILE IMPORTS ASSOCIATION, INC., Pace Imports,
Inc., Intercol Corporation and Texas Coach
Company, Plaintiffs-Appellees,
v.
Bob TOWNSLEY, Mark Goode, and Jim Mattox, Defendants-Appellants.
 No. 85-2773.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 5, 1986.
 
 Eliot Shavin, Asst. Atty. Gen., Dallas, Tex., Mary F. Keller, Delmar L. Cain, Austin, Tex., for Townsley, Goode and Mattox.
 Richard Frankel, Houston, Tex., Joseph E. Innamorati, Montvale, N.J., for amicus curiae Mercedes-Benz of North America.
 Van E. McFarland, McFarland & Tondre, Houston, Tex., for Direct Auto. Imports and Pace Imports.
 David C. Godbey, Dallas, Tex., for amicus curiae Texas Auto. Dealers Ass'n.
 Appeal from the United States District Court for the Southern District of Texas.
 Before POLITZ, RANDALL and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 The appellants appeal from the district court's grant of a preliminary injunction, enjoining the enforcement of H.B. 1805, a Texas statute regulating gray market automobiles (imported automobiles not originally designed for the U.S. market). The district court premised its grant of the injunction on its findings that the Texas statute was preempted by provisions of two federal statutes: the Clean Air Act, 42 U.S.C. Secs. 7401 et seq., and the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. Sec. 1381 et seq. While we agree with the district court that the Texas statute is preempted by the Clean Air Act, we hold that it is not preempted by the Motor Vehicle Safety Act. Accordingly, we affirm the district court's grant of a preliminary injunction only as it applies to that portion of the statute preempted by the Clean Air Act, and remand the case for further proceedings not inconsistent with this opinion.
 
 
 2
 * So-called "gray market" automobiles are imported cars which were not originally designed or intended for the American market. Such cars may be sold for use in this country provided that they are modified to comply with the applicable federal safety and emissions standards. These standards are set out by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. Sec. 1381 et seq. ("the Safety Act"), and the Clean Air Act, 42 U.S.C. Sec. 7401 et seq., and by the regulations promulgated under them. The regulations state that the importer of a noncomplying vehicle must post a bond with the Customs Service in an amount at least equal to the value of the vehicle to secure the completion of the required modifications. 19 C.F.R. Secs. 12.73 and 12.80. When the importer has successfully modified the vehicle and demonstrated compliance with the applicable safety and auto emission standards, the bonds are released. Despite the cost of modifications, gray market automobiles are substantially less expensive than the same manufacturer's models designed for the American market.
 
 
 3
 The Environmental Protection Agency ("EPA") administers the Clean Air Act. To comply with EPA emission standards, the importer first has the vehicle tested by an EPA "recognized" laboratory. EPA examiners review the formal results of the tests to determine the eligibility of the laboratory to perform the tests and to determine if the vehicle complies with the applicable standards. If the EPA finds the results to be satisfactory, it issues a formal notice to the Customs Service approving release of the bond involved.
 
 
 4
 The Department of Transportation ("DOT") administers the Safety Act, and does not require testing of the vehicle. Instead, the importer is required to submit a detailed statement of compliance with the DOT, demonstrating that the vehicle meets applicable standards. If the DOT accepts the compliance statement, it issues a notice to the Customs Service consenting to the release of the bond involved. The federal regulations allow the importer 90 days to meet the EPA standards (with a single extension of 90 days), and 120 days to meet the DOT standards (with a single extension of 60 days). At both the EPA and the DOT, there exists a significant backlog in the processing of applications for approval. Once modifications have been completed, it may take up to an additional six months for the bond release letters to issue. Under both DOT and EPA regulations, the vehicle may not be sold or offered for sale until both agencies have issued bond release letters.
 
 
 5
 In the context of this federal regulatory system, the State of Texas has enacted H.B. 1805, governing the titling of gray market automobiles. H.B. 1805 provides:
 
 
 6
 Before a motor vehicle not manufactured for sale or distribution in the United States may be registered and titled in Texas, the applicant shall furnish to the designated agent: (1) a bond release letter, with all attachments, issued by the United States Department of Transportation acknowledging receipt of a statement of compliance submitted by the importer of the vehicle and that the statement meets the safety requirements of 19 C.F.R. 12.80(e); and (2) a bond release letter, with all attachments, issued by the United States Environmental Protection Agency stating that the vehicle has been tested and shown to be in conformity with federal emission requirements; and (3) a receipt of certificate issued by the United States Department of Treasury showing that any and all gas guzzler taxes due on the vehicle under the provisions of Pub.L. No. 95-618, Title II, Section 201(a) (16 U.S.C.A. 4064) have been fully paid; or (4) proof satisfactory to the agent that the vehicle was not brought into the United States from outside the country.[1]
 
 
 7
 The plaintiffs are in the business of importing gray market automobiles.[2] The defendants are state officials charged with enforcement of the Texas statute; they are being sued in their official capacities only. The plaintiffs filed suit in federal district court, seeking declaratory and injunctive relief, claiming that the Texas statute was preempted by federal law and that it violated the Commerce Clause of the United States Constitution. The district court held that the Texas statute was preempted by the Clean Air Act and by the Motor Vehicle Safety Act and issued a preliminary injunction against enforcement of the statute. The defendants appeal.
 
 II
 
 8
 Article VI, clause 2 of the United States Constitution, better known as the Supremacy Clause states:
 
 
 9
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land, and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
 
 
 10
 The Supreme Court has set out the several ways a federal statute may preempt state law:
 
 
 11
 Federal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law.... Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government.... Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible ... or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."
 
 
 12
 Michigan Canners & Freezers v. Agricultural Board, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citations omitted).
 
 
 13
 In this case, the appellees maintain (and the district court found) that the clear language of the Clean Air Act preempts the provision of H.B. 1805 requiring a bond release letter from the EPA as a precondition to obtaining Texas title. The appellants, on the other hand, contend that the legislative history of the Clean Air Act shows that H.B. 1805 is not preempted. The Clean Air Act contains its own preemption provision:
 
 
 14
 No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
 
 
 15
 42 U.S.C. Sec. 7543(a).
 
 
 16
 The explicit language of this section clearly preempts the provision of H.B. 1805 requiring a bond release letter from the EPA. The language of section 7543(a) is unambiguous: states may not require certification, inspection, or any other approval relating to emission control as a condition precedent to the titling of a new motor vehicle. The appellants argue from the legislative history that Congress meant only to preclude states from enforcing their own standards, not federal standards as is the case here. But the language of the statute draws no distinction between federal and state standards. Although the courts have not been completely consistent in the canons of statutory construction, where the statutory language is clear and unambiguous, it is controlling, and no resort is made to legislative history (absent exceptional circumstance such as unequivocal legislative history to the contrary). Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); Aloha Airlines v. Director of Taxation, 464 U.S. 7, 12, 104 S.Ct. 291, 294, 78 L.Ed.2d 10 (1983); Howe v. Smith, 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981); Steere Tank Lines, Inc. v. I.C.C., 724 F.2d 472, 477 (5th Cir.1984); Quarles v. St. Clair, 711 F.2d 691, 698 (5th Cir.1983).
 
 
 17
 The appellants argue, however, that Congress did not anticipate the gray market situation and that Congress was chiefly concerned with the application of independent state standards. We do not regard the appellants' arguments as sufficient to outweigh the clear language of the statute, and we conclude that the Clean Air Act preempts H.B. 1805 to the extent that it requires certification or proof of compliance with federal auto emission standards as a precondition to obtaining title. In reaching this result, we note our agreement with recent decisions invalidating similar regulatory provisions in Georgia and Florida. Georgia Auto Importers Compliance v. Bowers, 639 F.Supp. 352, 357 (N.D.Ga.1986); Sims v. State of Florida, No. TCA 85-7214--WS (N.D.Fla., Dec. 30, 1985)
 
 
 18
 The appellants and amici argue in the alternative that the Clean Air Act preemption provision is inapplicable here because section 7543(a) in its own words applies only to "new motor vehicles." The appellants argue that since gray market automobiles are not purchased directly from manufacturers but are acquired through retail purchases, they are not "new motor vehicles" within the meaning of the Act. This statutory interpretation is wrong. The Clean Air Act's definition of new motor vehicles with regard to foreign cars is not dependent on whether the car has been sold previously:
 
 
 19
 (3) Except with respect to vehicles or engines imported or offered for importation, the term "new motor vehicle" means a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser; and the term "new motor vehicle engine" means an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser; and with respect to imported vehicles or engines, such terms mean a motor vehicle and engine, respectively, manufactured after the effective date of a regulation issued under section 7521 of this title which is applicable to such vehicle or engine (or which would be applicable to such vehicle or engine had it been manufactured for importation into the United States).
 
 
 20
 42 U.S.C. Sec. 7550(3) (emphasis added). We therefore conclude that the preemption clause of the Clean Air Act does apply.
 
 III
 
 21
 Whether H.B. 1805 is preempted by the Motor Vehicle Safety Act is a more difficult issue. The district court held that it was. We disagree. H.B. 1805 requires a bond release letter from the DOT as proof of compliance with federal automobile safety standards. Since nothing in the language of the statute preempts this state requirement, and the legislative history shows no clear intent to preempt in this respect, we conclude that the Motor Vehicle Safety Act does not preempt H.B. 1805. Like the Clean Air Act, the Motor Vehicle Safety Act contains its own preemption provision:
 
 
 22
 (d) Supremacy of federal standards; allowable higher standards for vehicles used by Federal or state governments
 
 
 23
 Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.
 
 
 24
 15 U.S.C. Sec. 1392(d). The statutory language prohibits a state from establishing an independent safety standard unless the standard is identical to the federal one. The language makes clear, however, that a state is not preempted from enforcing state standards which are identical to the federal ones.
 
 
 25
 Nothing in the above language prohibits the state's requirement that federal safety standards be complied with. The State of Texas is not setting up any independent standard of its own. It is not even creating independent enforcement mechanisms. H.B. 1805 merely requires proof of compliance with federal law as a condition precedent to obtaining state title. There is therefore no language on the face of the statute preempting H.B. 1805.
 
 
 26
 The appellees, however, urge us to affirm the district court's finding that H.B. 1805 is preempted because the legislative history indicates that Congress intended to preclude the states from enforcing any safety standards (whether state or federal), prior to the initial retail sale to a consumer. The appellants respond that any distinction between presale and postsale enforcement is inapplicable here. Our own conclusion is that the legislative history does not reveal a clear intent to preempt in this context.
 
 
 27
 Automobile safety, like other health and safety matters, has traditionally been a matter of state regulatory concern (the traditional "police power"). A federal statute is presumed not to preempt regulation of matters traditionally within the state police power unless there is a clear and manifest purpose that Congress intended to do so. Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985); Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). This assumption provides assurance that "the federal state balance" will not be disturbed unintentionally by Congress or unnecessarily by the courts. Jones v. Rath Packing Co., 430 U.S. at 525, 97 S.Ct. at 1309. Since there is no clear intent to preempt here, we hold that H.B. 1805 is not preempted.
 
 
 28
 The preemption clause was amended in October 1982. We now turn to the pre-1982 amendment history. As will become clear, such an inquiry is necessary in order to understand the 1982 amendment. Prior to the amendment, the clause read:
 
 
 29
 (d) Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.
 
 
 30
 15 U.S.C. Sec. 1392(d) (prior to 1982 amendment).
 
 
 31
 The district court's analysis relied heavily on two pre-amendment interpretations of the preemption clause. The district court read the interpretations made by the court in Truck Safety Equipment Institute v. Kane, 466 F.Supp. 1242 (M.D.Pa.1979), and by the National Highway Traffic Safety Administration in January 1982 as holding that the intent of Congress was to preclude the states from presale enforcement of even federal safety standards. Our own reading of these interpretations, as well as the legislative history, persuades us that those interpretations are inapplicable in this context, even absent the 1982 amendments.
 
 
 32
 The court in Kane concluded that a Pennsylvania regulatory scheme was preempted where it required that vehicle safety equipment items be submitted for independent state approval as a precondition to lawful sale in the state. Even though the state safety standards were identical to the federal standards, the court found that Pennsylvania's program was preempted because it frustrated the purpose of the statute, uniformity of standards. Id. at 1250. According to the court, the state program which required independent testing, as well as payment of fees for the testing, significantly burdened the goal of national uniformity because the sale of federally certified equipment could be impeded. No such concerns are applicable here because the Texas statute imposes no additional burdens or requirements on the manufacturer or importer. Texas has not set up any independent state testing or monitoring system, nor is it assessing any fees. In other words, Texas is not requiring the importers of gray market vehicles to do anything with respect to the automobiles that federal law does not already require them to do. Therefore, the Kane decision does not apply to H.B. 1805.
 
 
 33
 The National Highway Traffic Safety Administration ("NHTSA") issued its own interpretation of the preemption clause. Federal Motor Vehicle Safety Standards: Interpretation Regarding Preemption and Pre-Sale State Enforcement of Safety Standards. 47 Fed.Reg. 884 (advisory letter) (1982).[3] The agency's interpretation of the clause was influenced by the Kane decision, and it adopted much of the Kane court's reasoning. But the Texas statute is consistent with the agency's interpretation as well as the Kane decision. In interpreting the preemption clause, the agency came to the following conclusion:
 
 
 34
 Accordingly, it is the position of the NHTSA that any State requirement which necessitates that manufacturers pay fees in order to obtain approval under a state standard identical to a FMVSS [federal motor vehicle safety standard], and any imposition of requirements for approval which has the effect of proscribing the sale of equipment certified under the Act to a standard such as FMVSS 218 would be preempted by operation of the Act and of the agency's action in adopting the Federal standard in question. 47 Fed.Reg. at 885.
 
 
 35
 We first note that H.B. 1805 places no burden on the manufacturer, which was clearly the concern behind the interpretation. H.B. 1805 does not involve the payment of any fees, nor does it have the effect of proscribing the sale of federally certified equipment. Indeed, H.B. 1805 does not require any certification except federal certification by federal authorities. As best we can tell, the original pre-1982 amendment provision was enacted to assure uniformity of standards for manufacturers so vehicles and equipment meeting the federal standards could be sold freely in any state. See remarks of Senator Magnuson (one of the Motor Vehicle Safety Act's sponsors) 112 Cong.Rec. S14230 (daily ed. June 14, 1966) (remarks of Senator Magnuson). The Texas statute, H.B. 1805, does not impair this objective since it creates no independent state standard or certification of the automobiles.
 
 
 36
 In addition, interpretations of the original preemption provision by the district court in Kane and by the NHTSA have held that independent state presale enforcement schemes that impair the sale of federally certified equipment are also preempted. H.B. 1805 is consistent with those interpretations since it neither establishes a state enforcement system nor impairs the sale of federally certified vehicles or equipment; it requires only that they be federally certified. Consequently, we cannot find a clear intent to preempt H.B. 1805 based on a reading of the pre-amendment legislative history.
 
 
 37
 The parties dispute the significance of the 1982 amendment. The appellants argue that the amendment was meant to do away with Kane and the NHTSA interpretations of the preemption clause. The appellees, on the other hand, contend that Congress meant to codify these interpretations. Although it is not apparent in the legislative history that Congress disapproved of the Kane and NHTSA interpretations, it is clear that Congress meant to respond to those interpretations by reemphasizing the role of the states in enforcing federal standards. The following passage from the Senate Report on the amendment is informative. After discussing the Kane decision and the NHTSA interpretation, the report adds:
 
 
 38
 Because the Federal court cases and the NHTSA opinion change the scope of traditional State enforcement of safety standards, much uncertainty has resulted concerning the appropriate role of the States. It is the Committee's belief that the States have an active and positive role to play in protecting motor vehicle safety, and that this is consistent with the federal statute. The Committee intends, however, that political subdivisions within States should not have separate enforcement authority because the exercise of such authority by large numbers of political subdivisions would impose unreasonable burdens on manufacturers.
 
 
 39
 The Committee intends that States are not preempted from enforcing safety standards identical to Federal standards which they have adopted. States may not require certification or approval of motor vehicles or motor vehicle equipment. However, State enforcement may be carried out according to applicable State laws. States may undertake independent testing, and also may require manufacturers to submit adequate test data concurrent with first sale or thereafter.
 
 
 40
 S.Rep.No. 505, 97th Cong., 2d Sess. 6, reprinted in 1982 U.S. Code Cong. & Ad.News 3169, 3174.
 
 
 41
 A similar explanation of the amendment was given by Representative Wirth (a sponsor of the amendment prior to the passage of the amendment. 128 Cong.Rec. H3938 (June 14, 1982) (remarks of Rep. Wirth). It is unclear whether the amendment meant to approve or disapprove the Kane and NHTSA interpretations. According to Representative Dingell, the amendment was meant to be consistent with the prior interpretations. 128 Cong.Rec. H3440 (June 14, 1982) (remarks of Rep. Dingell). We are, however, unable to find any intent to preempt a statutory framework like that within H.B. 1805. The appellees argue that presale enforcement by states is precluded by the amendment because the Senate report provides that states "may not require certification or approval of motor vehicles or motor vehicle equipment." S.Rep. No. 505, 97th Cong.2d Sess. 6, reprinted in 1982 U.S. Code Cong. & Ad.News 3169, 3174. But we do not regard the system established by H.B. 1805 as one requiring "certification or approval" as contemplated by the federal statute. Given the Kane case,[4] we are convinced that the report refers to state certification or approval under independent state enforcement systems. But H.B. 1805 does not require any state certification of compliance or approval; it merely requires proof that the federal agency has certified or approved the particular vehicle. In fact, the statute expresses no concern as to whether the vehicle has actually complied with federal standards so long as the federal agency says that it has done so.
 
 
 42
 In sum, we find that the plain language of the preemption clause does not preclude the State of Texas from requiring federal certification as a precondition to obtaining state title. At most, the legislative history shows an intent to preempt state presale enforcement of federal standards where the sale of federally certified equipment is impaired by an independent state compliance system. Since Texas is not impairing the sale of federally certified equipment, but only requiring that such equipment must be federally certified as a precondition to state title, we conclude that Congress demonstrated no clear intent to preempt the Texas statute. We therefore hold that the Motor Vehicle Safety Act does not preempt H.B. 1805, and that the district court erred in granting a preliminary injunction against that portion of the statute dealing with federal automobile safety standard compliance.
 
 IV
 
 43
 The appellees also claim that H.B. 1805 violates the commerce clause of the Constitution, art. 1, Sec. 8, cl. 3.[5] We find no merit in this claim.
 
 
 44
 The commerce clause is not only a source of congressional authority, but also an affirmative limitation on the power of states to regulate interstate and foreign commerce. Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981). In determining whether a state statute is valid under the commerce clause, we must weigh the state regulatory concerns against the burden imposed on the course of interstate commerce. Id. at 670-71, 101 S.Ct. at 1316.
 
 
 45
 Regardless of the actual purpose behind it, we cannot conclude that H.B. 1805 violates the commerce clause, because its burden on interstate commerce is either minimal or nonexistent. H.B. 1805 does not require importers of gray market automobiles to take any steps that federal law did not already require them to take. Therefore it does not burden interstate commerce any more than federal law does.[6] In any case, requiring proof of compliance with federal standards can be no more burdensome on commerce than requiring license plates or safety stickers. We therefore conclude that H.B. 1805 does not violate the commerce clause.
 
 
 46
 The district court's judgment is affirmed with respect to its grant of a preliminary injunction against the section of H.B. 1805 requiring compliance with federal auto emission standards, but is reversed with respect to its grant of a preliminary injunction against the section of H.B. 1805 requiring compliance with federal automobile safety standards. The case is remanded to the district court with instructions to modify its injunction in accordance with this opinion and to enter appropriate judgment.
 
 
 47
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The parties present different rationales for the law's passage. According to the appellees, the Texas law is an anti-competitive device designed to protect Mercedes Benz and other foreign car manufacturers from competition from gray market cars which are cheaper than their U.S. market models. According to the appellants, the Texas law was enacted as a consumer protection measure to protect the public from imported cars which do not comply with federal standards. Whether or not either of these claims is true is irrelevant here since our inquiry is focused on issues of law, not policy
 
 
 [2]
 According to the plaintiffs, the consequences of H.B. 1805 on their business will be severe. The law will make it more difficult to title gray-market cars because of delays at the relevant federal agencies. This, in turn, will harm the plaintiffs because state title is necessary before financing can be obtained for the automobiles
 
 
 [3]
 It is important to note, however, that this interpretation was handed down prior to the 1982 amendment to the statute
 
 
 [4]
 In Truck Safety Equipment Institute v. Kane, 466 F.Supp. 1242 (M.D.Pa.1979), the state program required vehicle equipment to be "submitted for approval" as a precondition to sale. In order to obtain approval, equipment had to be submitted for testing by the state or its agent, with the costs of the testing to be paid by the manufacturer. This is most likely the sort of certification or approval scheme discussed in the Senate report, since the Kane decision was also discussed
 
 
 [5]
 Although this issue was squarely raised by the litigants in the district court, it was not adjudicated by that court. For the sake of expediting the resolution of this case, we now decide the commerce clause issue on appeal
 
 
 [6]
 Our approach with regard to the commerce clause issue is similar to the one employed by the court in Georgia Auto Importers Compliance v. Bowers, 639 F.Supp. 352 (N.D.Ga.1986)