639 F.Supp. 352 (1986)
GEORGIA AUTOMOBILE IMPORTERS COMPLIANCE ASSOCIATION, INC., a Georgia corporation; German Connection, Ltd.; and Thomas H. Baker
v.
Michael J. BOWERS, Attorney General of the State of Georgia; Marcus E. Collins Jr., Commissioner of the Georgia Department of Revenue; Clint Moye, Director of the Division of Motor Vehicles of the Georgia Department of Revenue; and Mary McMichael, an employee of the Division of Motor Vehicles of the Georgia Department of Revenue.
Civ. A. No. 85-4121-A.
United States District Court, N.D. Georgia, Atlanta Division.
June 13, 1986.
*353 Jack H. Watson, Jr., Long & Aldridge, Atlanta, Ga., for plaintiffs.
Grace E. Evans, Asst. Atty. Gen., Atlanta, Ga., for defendants.

ORDER
O'KELLEY, District Judge.
Presently before the court is the motion of plaintiffs for a preliminary and permanent injunction. Plaintiffs seek to have certain Georgia statutes found in violation of the United States Constitution. The court advanced and consolidated the hearing on the preliminary injunction with the trial of the suit on the merits. Fed.R. Civ.P. 65(a)(2). The trial was held on May 6, 1986. Upon review, the court finds that Georgia's statutes, O.C.G.A. §§ 40-2-25.1, 40-3-29.1, and 16-9-110 violate the preemption clause of the Clean Air Act, 42 U.S.C. § 7543(a), and enjoins the statutes to the extent that they attempt to regulate emissions controls governed by the Clean Air Act. The court declines to enjoin the *354 Georgia statutes as they attempt to regulate safety standards, finding that the statutes were not preempted by 15 U.S.C. § 1392(d) of the National Traffic and Motor Vehicle Safety Act. Finally, the court finds that the Georgia statutes do not violate the commerce clause and are not unconstitutionally vague.
Plaintiffs are Georgia Automobile Importers Compliance Association, Inc. (GAICA), an organization that represents companies involved in some manner with direct importation of foreign automobiles, the German Connection Ltd., a firm which acts as broker in the importation of these vehicles, and Thomas Baker, who purchased a direct import vehicle. A direct import vehicle[1] is one that has been imported into this country by an independent entity, not by an authorized dealer of the manufacturer. These vehicles were not manufactured to comply with United States clean air and safety standards. (See stipulation of facts, ¶ 1, at 1).
Two federal statutes posit requirements for all vehicles that are manufactured in or imported into the United States. First, the Clean Air Act, 42 U.S.C. § 7521, et seq. (1982) (CAA), prohibits the sale, delivery for introduction or introduction into commerce, or importation of a new motor vehicle or engine, unless that vehicle is covered by a certificate of conformity issued under regulations prescribed by the statute. Id. § 7522(a)(1). An exemption exists, however. The Administrator of the Environmental Protection Agency (EPA) and the Secretary of the Treasury may provide by regulation "for deferring final determination as to admission and authorizing the delivery of [a new] motor vehicle or engine offered for import to the owner or consignee thereof upon such terms and conditions ... as ... appropriate to insure that ... [the] vehicle or engine will be brought into conformity with" the statute. Id. § 7522(b)(2). These regulations have been promulgated. 40 CFR 85.1501.09 (1985)
Additionally, the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1392(a) (1982) (MVSA), provides that the Secretary of Transportation shall establish federal motor vehicle safety standards. No vehicle shall be manufactured, sold, offered for sale, delivered for introduction or introduced into commerce, or imported unless it is in conformity with applicable federal safety standards. Id.
An exemption from the safety standard requirements is provided for imported motor vehicles or equipment. The Secretaries of Transportation and the Treasury are permitted to provide for the importation of the vehicle or equipment "as may appear ... appropriate to insure that [the] ... vehicle or ... equipment will be brought into conformity with any applicable Federal ... safety standard." Id. § 1397(b)(3). The respective secretaries have set up a procedure in accordance with this statute. 19 CFR 12.80 (1985).
The parties have stipulated that certain procedures must be followed to garner the federal exemptions. The court has reviewed the stipulation and lists in a footnote those portions which are pertinent to the instant case.[2]
*355 The challenged Georgia statutes are O.C. G.A. §§ 40-2-25.1, 40-3-29.1, and 16-9-110 (1985). The statutes became effective on July 1, 1985. Section 40-2-25.1 provides that:
(a) No application shall be accepted and no certificate of registration shall be issued to any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the "Clean Air Act", ... and as required by ... the "National Traffic and Motor Safety Act," ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
O.C.G.A. § 40-2-25.1(a) (1985).[3]
Section 40-3-29.1 states that:

*356 [N]o application shall be accepted and no certificate of title shall be issued to any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the "Clean Air Act" ... and as required by the "National Traffic and Motor Safety Act," ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
O.C.G.A. § 40-3-29.1 (1985).[4]
Section 16-9-110 provides that:
(a) It shall be unlawful for any person, firm, or corporation knowingly to sell, transfer, or otherwise convey any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the "Clean Air Act," ... and the "National Traffic and Motor Safety Act," ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards.
O.C.G.A. § 16-9-110(a) (Supp 1985).[5]

PREEMPTION
Plaintiffs claim that the Georgia statutes are invalid in that they are preempted under the supremacy clause of the federal constitution, U.S. Const. Art. 6, Cl. 2, violate the commerce clause, U.S. Const. Art. 1, § 8, Cl. 3, and are vague.[6] Under the supremacy clause, federal law may preempt state law in a variety of ways. Congress may supersede state law by so stating in express terms. Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Without express language, congressional intent to preempt may be inferred when the federal regulatory scheme is so comprehensive ted when the federal interest in a field is dominant to the point that state laws on the same subject would be precluded. Id. In an area wherein complete preemption is not apparent, state law that actually conflicts with, or is an obstacle to the purposes of, the federal law, is invalid to that extent. Id.
In the instant case, both statutes contain preemptive language. The CAA provides as follows:

*357 [N]o State ... shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.
42 U.S.C. § 7543(a).
Section 7543(a) thus falls within that category of preemption in which Congress has expressed its intent clearly. The statute prohibits a state from requiring certification or any approval relating to emissions control for any new motor vehicle[7] as a condition precedent to the vehicle's initial retail sale, titling, or registration in the state. Georgia's statutes require certification and approval from EPA prior to the initial Georgia registration, O.C.G.A. § 402-25.1(b), and initial Georgia titling, id. § 40-3-29.1(b). Further, a vehicle cannot be sold until it receives federal approval. Id. § 16-9-110(a).
The Georgia statutes thus fall within the scope of federal preemption under the CAA. Admittedly, a presumption exists that state regulation of health and safety matters is not superseded by federal law. Hillsborough, 105 S.Ct. at 2376. The presumption, however, is rebutted by an indication that preemption was "the clear and manifest purpose of Congress." Id. In the case at bar, Congress clearly and expressly has indicated that statutes such as Georgia's are preempted by the CAA.
Defendants argue that the legislative history of § 7543(a) indicates Congress's intent not to preempt statutes like those in question. When a federal statute unambiguously and clearly prohibits state action, an inquiry into legislative history is neither appropriate nor needed. Aloha Airlines Inc. v. Director of Taxation of Hawaii, 464 U.S. 7, 12 & n. 5, 104 S.Ct. 291, 294 & n. 5, 78 L.Ed.2d 10 (1983). Congress made clear its intent in § 7543, and further inquiry is not proper.
The MVSA also contains a preemption provision.
Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State ... shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.
15 U.S.C. § 1392(d) (1982).
Unlike the preemption section of the CAA, § 1392(d) does not indicate clearly whether it preempts the Georgia statutes. Certainly, a state may not establish or continue any safety standard that is not identical to federal standards, and may enforce identical safety standards. The language in § 1392(d), however, does not answer the question whether the Georgia statutes actually are enforcing identical standards. Additionally, the provision does not address the distinction between pre and post sale regulation. The 1982 amendment, which added the last sentence, has not totally clarified the picture. To answer the questions and thus the ultimate issue of preemption, the court must search the legislative history of § 1392(d).
The MVSA was enacted in 1966, to attempt to halt the carnage occurring on the nation's roads. 15 U.S.C. § 1381 (1982). The preemption provision, minus the language of the 1982 amendment, was in the original statute. Another provision of the statute indicates that the MVSA was to *358 regulate motor vehicle safety before the first sale. 15 U.S.C. § 1397(b)(1) provides that the prohibitions of that section "shall not apply to the sale, the offer for sale, or the introduction ... in interstate commerce of any motor vehicle or ... equipment after the first purchase of it in good faith for purposes other than resale." Id. The legislative history supports that interpretation. See S.Rep. 1301, 89th Cong. 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad. News 2709, 2719-20. Additionally, the conference report noted that the preemption language would assure that "inadvertent preemption of a State standard applicable to an older vehicle" would not occur "by the issuance of a standard with respect to the same aspect for performance of a new vehicle." Conf.Rep. 1919, 89th Cong. 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 2731, 2733.
The 1966 legislative history indicates that Congress wanted uniform federal safety standards. See H.Rep. 1776, 89th Cong., 2d Sess. 17 (1966) ("[T]his preemption section is intended to result in uniformity of standards so that the public as well as industry will be guided by one set of criteria rather than by a multiplicity of diverse standards."); Cong.Rec. 14230 (daily ed. June 24, 1966) (Remarks of Senator Magnuson) ("[T]he bill suggests to States that if we set a minimum standard, a car complying with such standard should be admitted to all States."). Nonetheless, Congress expected that the states would have a role in automobile safety. S.Rep. 1301, 8th Cong. 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News, 2709, 2720. ("[T]he committee believes that the States should be free to adopt standards identical to the Federal standards, which apply only to the first sale of a new vehicle, so that the States may play a significant role in the vehicle safety field by applying and enforcing standards over the life of the car.").
Thus, the MVSA as originally enacted limited federal supremacy to the first sale of a new vehicle and earlier. The states were to play a substantial role thereafter. States could enforce only identical standards. The language of the Act and legislative history seem to indicate that the states could apply identical standards over the life of the car after its first sale.
In 1971, the NHTSA issued an opinion on state preemption. NHTSA, Motor Vehicle Safety Standards; Interpretation Regarding Limits on State Enforcement Procedures; 36 Fed.Reg. 10744 (June 2, 1971). The opinion concerned states which required manufacturers to submit samples of equipment to a test laboratory. The test results were given to a state agency which would issue an approval. The states would not permit sale of the equipment before approval, even though the product complied with federal standards. Id.
The NHTSA first noted that the states could enforce identical standards independently of federal enforcement. Id. at 10745. The question was to what extent the states could use an enforcement scheme different from that of the federal statute. Id. The agency found that the MVSA did not provide for state approval before a product is sold. Therefore, states were not permitted to require prior approval before sale or to otherwise restrict manufacture, sale, or movement of vehicles conforming to federal standards. Id.
In 1979, the United States District Court for the Middle District of Pennsylvania decided Truck Safety Equipment Institute v. Kane, 466 F.Supp. 1242 (M.D.Pa.1979). The Pennsylvania statute[8] under scrutiny set forth identical standards, but required that equipment be submitted for approval as a condition precedent to sale in the commonwealth. Id. at 1245. Fees were required to be paid. Id. at 1246.
The court in Kane found that the MVSA preempted the Pennsylvania statute. Id. at 1250. Looking to the legislative history, *359 the court held that states could enforce identical standards after the vehicle's first sale. Id. The court also found that the state statute was such a burden that it could be an obstacle to congressional goals of swift production and distribution of improved safety equipment. Id. at 1251.
In 1982, the NHTSA issued another opinion on the issue of preemption. NHTSA, Federal Motor Vehicle Safety Standards; Interpretation Regarding Preemption and Pre-Sale State Enforcement of Safety Standards, 47 Fed.Reg. 884 (Jan. 7, 1982). The question was whether state safety approval programs were preempted to the extent those programs sought to enforce safety standards identical to federal standards against new vehicles, "i.e., ones that have not yet been sold to consumers." Id. The particular statute at issue required approval of motorcycle helmets before sale, including payment of fees. Id.
The agency found that states "are preempted from engaging in activities involving the pre-sale enforcement of State standards ... identical to ... [Federal standards] where such activities involve procedures or impose burdens which differ ... from those of the Federal ... scheme...." Id. Congress intended NHTSA "to play an exclusive role in ensuring compliance of new motor vehicles and equipment," and intended that states would enforce their identical standards after the vehicles' first sale. Id.
The NHTSA also found that the Kane decision's broader position reflected congressional intent. Id. The agency analyzed the Act's legislative history to conclude that pre-sale enforcement was prohibited. Id. at 884-85. Finally, NHTSA held that
any State requirement which necessitates that manufacturers pay fees in order to obtain approval under a State standard identical to a ... [federal standard] and any imposition of requirements for approval which has the effect of proscribing the sale of equipment certified under the Act ... would be preempted by operation of the Act and of the agency's action in adopting the Federal standard in question.
Id.
Later in 1982, Congress amended the preemption provision of the MVSA by adding the following sentence: "Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard." 15 U.S.C. § 1392(d) (1982). Congress intended the provision to clarify states' roles in enforcing federal safety standards which they have adopted. S.Rep. 505, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad.News, 3169, 3173. The following excerpts from the Senate Report demonstrate the concerns of Congress.
At the Federal level, ... each motor vehicle or motor vehicle equipment manufacturer or distributor must furnish to the dealer or distributor at the time of delivery of such vehicle or equipment the certification that each such vehicle or item of motor vehicle equipment conforms to all applicable Federal motor vehicle safety standards.... States have maintained that their approval systems complimented the Federal Scheme and ensured that all equipment met Federal standards.
....
Current section 103(d) [1392(d)] ... provides that if a Federal motor vehicle safety standard is in effect, no State or political subdivision of a State may establish a different standard. This section, however, does not directly address the authority of State to enforce safety standards identical to the Federal standards.... States have assumed an active role in enforcing Federal Safety standards which they have adopted as their own.... [I]n 1971, NHTSA determined that States may enforce standards identical to Federal standards, including requiring submission of items for State approval, as long as such procedures do not prohibit the sale of a manufacturer's equipment pending State approval.
....

*360 [I]n January, 1982, NHTSA issued a new opinion on section 103(d) which paralleled ... [Kane] and stated that the Safety Act pre-empts States from presale enforcement of safety standards, ... and prohibits States from imposing requirements for State approval which have the effect of prohibiting the sale of equipment which has been self-certified under the Federal statute. In effect, this interpretation changes the methods available to States to enforce safety standards. Because the Federal court cases and the NHTSA opinion change the scope of traditional State enforcement of safety standards, much uncertainty has resulted concerning the appropriate role of the States. It is the Committee's belief that States have an active and positive role to play in protecting motor vehicle safety, and that this is consistent with the federal statute.
....
The Committee intends that States are not pre-empted from enforcing safety standards identical to Federal standards which they have adopted. States may not require certification or approval of motor vehicles or motor vehicle equipment. However, State enforcement may be carried out according to applicable State laws. States may undertake independent testing, and also may require manufacturers to submit adequate test data concurrent with first sale or thereafter.
....
Because the Federal role in enforcing safety standards is one of compliance testing on a random basis, the Committee believes that State programs will complement the Federal regulatory scheme.
Id. at 3173-74. See also H.Rep. 576, 97th Cong., 2d Sess., 6-7 (1982).
Additional statements made on the floor of the House when the bill was passed also indicate congressional intent. Representative Wirth noted that the states had followed the NHTSA 1971 guidelines, which allowed states to enforce safety standards by requiring state approval, as long as sale was permitted pending approval. 128 Cong.Rec. H3438 (Daily ed. June 14, 1982) (Remarks of Rep. Wirth). "[A] recent court case and NHTSA opinion have changed the scope of traditional State enforcement." Id. The amendment "establishes a scheme for State efforts.... States are not prohibited from enforcing any safety standard identical to Federal standards. While States may not require certification or approval of motor vehicles or equipment, States may disapprove these products in determinations made through independent testing, or examination of test data...." Id. Representative Wirth concluded that "a partnership of Federal and State enforcement of safety standards best served the national interest by providing the necessary checks by States of the Federal self-certification program." Id.
Representative Moorhead noted that the amendment provides "an affirmative statement that States have a role to play in enforcing motor vehicle safety standards." 128 Cong.Rec. H3439 (Daily ed. June 14, 1982) (Remarks of Rep. Moorhead). He further said that States may not require certification or approval of motor vehicles and equipment, and may not impose fees for laboratory approvals. Id.
In remarks made and inserted in the Congressional Record of June 14, 1982, Representative Dingell noted that the 1982 NHTSA opinion found that states were preempted from presale enforcement of standards, from requiring fees for approval, and from requiring approval which would prohibit the sale of self-certified equipment. 128 Cong.Rec. H3439-40 (Daily ed. June 14, 1982) (Remarks of Rep. Dingell). Representative Dingell went on to state that the amendment "is consistent with this ruling.... States may not require certification or approval of motor vehicles or ... equipment, and hence may not impose product certification or approval fees.... However, States may undertake independent testing of vehicles or equipment, and may require manufacturers to submit adequate data concurrently with the *361 first sale within a State, or thereafter." Id. H3440.
What emerges from the legislative history of the MVSA and amendment is not totally clear. Obviously, a state may enforce standards identical to federal standards. A state may not require certification or approval, but may require test data or independent testing. The legislative history indicates that the latter is permitted concurrent with the first sale and afterward.
A major question is what exactly Congress meant by prohibiting certification or approval. A state may require test data, and if the data indicates that the vehicle is not in compliance with federal standards, the state may use "remedies, including prohibition, in accordance with relevant State laws." S.Rep. 505, at 6, 1982 U.S.Code Cong. & Ad.News at 3174. In a sense, then, Congress is permitting states to approve the vehicle's safety. Another facet of the prohibited certification or approval is found in Representative Dingell's statement that states may not require payment of fees. Cong.Rec. (daily ed. June 14, 1982) H3440. Additionally, the Senate Report, the House Report, and statements on the House floor indicate that states may require test data concurrent with the first sale or thereafter. Representative Dingell's remarks indicate that this means first sale within the state. The legislative history also expresses an intention not to hold up sales of federally conforming vehicles awaiting state approval.[9]
Although § 1392(d) is not extremely clear, an analysis of the statute, legislative history, cases, and NHTSA opinions indicates that § 1392(d) does not preempt the Georgia statutes. Surely, states have a vital role to play in the federal scheme of traffic safety. States may require that cars are in compliance with federal law.
The Georgia statutes merely mandate compliance. No inspection is necessary, no fees need be paid. A person merely must show that the car satisfies federal regulations. This procedure is in line with § 1392(d) and its legislative history. Additionally, the history indicates that a new car before its first sale is under federal regulations. The cars brought into this country already have been sold. Therefore, they are not within the federal preemption scheme. Congress wanted the states to insure that after the first sale, cars would continue to be safe. Additionally, the legislative history demonstrates that states may regulate concurrent with the first sale. Remarks to the effect that first sale meant within the state were made by only one representative, who did not even make his remarks on the floor but inserted them later. Even if the "sale" of the direct import car is not complete until the owner takes possession in Georgia, as plaintiffs *362 argue, the Georgia statutes are not preempted. They require compliance "concurrent with the first sale."
Finally, plaintiffs argue that defendants have set up no standards, and thus § 1392(d) preempts the statutes. Defendants admit that Georgia has not promulgated standards. Yet the effect of the statutes is to provide identical standards; the statutes insure compliance with federal law. The state merely makes the entire procedure less burdensome than it would be if it set up specific identical standards and then required test data. Compliance with federal standards is exactly what the MVSA contemplates, and is exactly what the Georgia statutes seek to accomplish. In effect, these statutes require compliance with state standards identical to federal standards, and § 1392(d) does not preempt them.

COMMERCE CLAUSE
Plaintiffs also argue that the Georgia statutes violate the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3. The Commerce Clause is a limitation on the states' power to regulate interstate and foreign commerce. Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981) (Powell, J., judgment of Court). A state may make laws governing matters of local concern which affect commerce, absent conflicting congressional legislation. Id. Although the extent of permissible state regulation may be difficult to ascertain, "a State's power to regulate commerce is never greater than in matters traditionally of local concern." Id. at 670, 101 S.Ct. at 1316. Regulations concerning safety, especially highway safety, are most reluctantly invalidated. Id. "`[I]f safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce.' (citations omitted)." Id. Those who wish to invalidate such safety regulations must overcome a presumption of validity. Id.
The presumed validity of state safety regulations, however, does not render them immune from attack. Regulations that further safety only marginally, and interfere with commerce substantially, may be invalid under the Commerce Clause. Id. A court must weigh the safety purpose against the interference with commerce. This procedure involves "`a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce.' (citations omitted)." Id. at 670-71, 101 S.Ct. at 1316.[10]
Under Supreme Court precedent, this court first must determine exactly what interest the Georgia statutes purport to protect, whether that interest is legitimate and of special local concern, and whether the statutes advance their alleged goals. The statutes protect the health and safety of the state's population, by assuring that cars will be safe and will not spew hazardous pollutants into the air. Clearly, health and safety are legitimate concerns, and are matters of traditional local importance. Kassel, 450 U.S. at 670, 101 S.Ct. at 1316. Prohibiting registration, titling, and safe of the vehicles in question furthers public health and safety by keeping off of the roads vehicles which have not received federal confirmation that they are safe and nonpolluting. Georgia's statutes substantially advance the legitimate state interests of health and safety.
The second inquiry in a Commerce Clause case is whether the state law in question burdens commerce, and if so, to what extent. The Georgia statutes mandate proof that the federal government would allow the vehicles in commerce. In that sense, Georgia requires no more of anyone trying to place a nonconforming vehicle into commerce than does the federal government. See 19 CFR 12.80(b)(iii); 40 CFR 85.1507. Thus, the state's laws do *363 not burden commerce any more than federal law does.
Plaintiffs' major contention apparently is that the alleged burden comes into play concerning foreign commerce. The argument is that Georgia's statutes burden the importation of non-conforming vehicles into the United States. The statutes impose no restrictions on the actual importation of these vehicles, nor do they require any special fees, payments, or taxes. Importers may bring the vehicles into a Georgia port as permitted by federal law.
Plaintiffs assert that the statutes discourage consumers from buying the non-conforming vehicles, and thus the importers do not bring in as many vehicles. First, conflicting evidence was introduced as to the reason for the decline in direct imports. Plaintiffs argued that the decrease correlated with the Georgia statutes, and offered testimony from Robert Webb, President of German Connection, Ltd., and others connected with the direct import business.
Defendants contended that the decline of the United States dollar overseas was responsible. That the value of the dollar declined during this time is undisputed. (Stipulation of Facts, ¶ 18 at 9). Defendants offered evidence that the decline in direct imports was nationwide, thus refuting the contention that the statutes caused the downturn. (Defendants' Ex. 7). Additionally, defendants presented testimony that Georgia banks were reluctant to finance these vehicles, because the automobiles were not in Georgia when the loans were requested. (Testimony of Gail Lynn, C & S Assistant U.P. & Consumer Credit Analyst). Gary Castrischer, Assistant Zone Underwriting Consultant-Auto, State Farm Mutual Automobile Insurance Co., averred that the company would not insure imported cars not in compliance with federal safety and emissions standards. (Defendants' Ex. 1).
Plaintiffs have not shown that the Georgia statutes caused the drop in sales. The decline of the dollar could well be the cause. Thus, they have not shown that the statutes burden commerce. Additionally, the extent of any burden is no greater than that imposed by federal laws governing non-complying vehicles. The statutes require nothing more than does the federal government. In fact, Georgia only requires compliance with federal law. It does not set up its own scheme. Likewise, any burden levied by Georgia is indirect.
The final step in the Commerce Clause analysis is to balance the weight and nature of the safety concerns against the extent of the burden on commerce. Kassel, 450 U.S. at 670-71, 101 S.Ct. at 1316. Georgia has a legitimate interest in its citizens' safety and health, and the statutes clearly and substantially further that interest. The statutes pose only a limited, indirect burden on interstate and foreign commerce. This burden certainly is no greater than that already imposed by federal law, because the statutes seek only to insure compliance with federal law. Thus, the statutes do not interfere with federal regulation of foreign commerce, nor do they prevent uniform national treatment of imports. Japan Lines, 441 U.S. at 452-53, 99 S.Ct. at 1823-24. The balance thus favors the state. Georgia's statutes do not violate the Commerce Clause.[11]

*364 VAGUENESS
Plaintiffs argue that the Georgia statutes are unconstitutionally vague. The statutes require certification by Customs, EPA, and DOT that the vehicle complies with applicable federal safety and emissions standards. Customs does not certify a vehicle's compliance but administers and liquidates the entry bond. The EPA does not certify compliance with safety standards. DOT issues a letter which is not a certification that the vehicle complies with federal law. Because no certification of safety by federal agencies ever is made, the Georgia statutes allegedly would preclude issuance of registration and title.
The court finds that the statutes are not vague. They put plaintiffs on notice that proof of federal compliance is a prerequisite to titling and registration. Evidence was presented that the state will accept the EPA or DOT letters, or Customs bond release. Mary McMichael, a supervisor with Georgia Department of Revenue, Motor Vehicle Division, testified that the state requested that the federal agencies inform them which forms are sent to importers to advise them of compliance. The agencies replied with copies of the above described letters, which the state accepts as certification. (Defendants' Ex. 3, 4, 5). The statutes thus are not unconstitutionally vague.
In sum, the court finds that Georgia's statutes, O.C.G.A. §§ 40-2-25.1, 40-3-29.1, and 16-9-110 violate the preemption clause of the Clean Air Act, § 7543(a), and enjoins the enforcement of those statutes to the extent that they attempt to regulate emissions controls governed by the Clean Air Act. The court also finds that § 1392(d) of the MVSA does not preempt the Georgia statutes, insofar as they deal with safety requirements. The court finds that the Georgia statutes do not violate the Commerce Clause, nor are they unconstitutionally vague.
The clerk is directed to enter judgment for the plaintiff against the defendant under the Clean Air Act and is directed to enter judgment for the defendant against the plaintiff as to the Motor Vehicle Safety Act.
NOTES
[1] These vehicles also are referred to as grey market, non-U.S. version, and non-conforming vehicles. The court will use these terms interchangeably throughout the order.
[2] importer of record must post an entry bond with Customs in an amount at least equal to the vehicle's value, plus duty. The amount of the bond varies.... The entry bond must be conditioned upon production of (1) an approval letter (also known as a bond release letter) issued by [the National Highway Transportation Safety Administration] NHTSA, ... upon approval of the conformity statement submitted by the importer ... and (2) an approval letter (also known as a bond release letter) from EPA declaring that the vehicle is in conformity with federal emission standards.... The [former] ... letter ... is the letter accepted by Customs and considered by NHTSA as the approval letter.... The bond required to be posted is not released by Customs until both EPA and NHTSA approval (or bond release) letters have been received by the District Director or Customs.
[T]he importer must file with Customs certain [declarations].... The EPA declarations are forwarded to EPA and the DOT declarations are forwarded to NHTSA by Customs. When Customs sends [an] EPA declaration Form ... to EPA, EPA sends a "Dear Importer" letter to the importer advising him of the EPA policies and regulations applicable to nonconforming vehicles.... An importer who declares that a vehicle is not in conformity with federal emission and safety standards, but will be brought into conformity with federal emission and safety standards, must do the following:
(i) Within five days following conditional admission of the vehicle, ... submit a written request to EPA that he be permitted to modify the vehicle so that it will be in conformity with applicable emission standards.
(ii) Within ninety days after entry of the vehicle (with a single extension of ninety days permitted), ... obtain the approval letter from EPA declaring that the vehicle is in conformity with federal emission standards.
(iii) Within 120 days after entry of the vehicle, or such additional time as NHTSA allows (not to exceed 180 days after entry), ... submit to NHTSA a Statement of Conformity certifying ... conformity with applicable federal safety standards. If the NHTSA approval (or bond release) letter is not received by the district director of Customs within 180 days after entry, the district director will issue a Notice of Redelivery requiring the redelivery to Customs custody of the vehicle.
[W]hen the duty and bond have been posted and the requisite declarations have been filed with Customs, Customs releases the nonconforming vehicle to the importer or his agent, subject to the conditions established by federal law...."
EPA regulations state that a nonconforming vehicle conditionally admitted must be stored and must not be sold or operated on the public highways until the vehicle has been granted final admission [40 CFR 85.1507]. [C]ustoms regulations state that the importer of a nonconforming vehicle is to certify ... that the vehicle will not be sold or offered for sale until NHTSA has issued its approval (or bond release) letter [19 CFR 12.80(b)(iii)].
After emission control modifications have been performed on a nonconforming vehicle, the vehicle is tested, and an emission test report is sent to EPA in Washington, D.C. for review....
After EPA receives the emission test report, EPA will either notify the importer that the test report is rejected or notify the importer and the District Director of Customs that the vehicle has been tested and shown to be in conformity with federal emission standards....
After the safety modifications have been performed on a nonconforming vehicle, a formal Statement of Conformity is signed by the importer and sent by the modifier, ... to NHTSA in Washington, D.C. for review.... After NHTSA receives the Statement of Conformity, NHTSA either approves or disapproves the Statement of Conformity or requests additional information from the importer or modifier. If NHTSA approves the Statement of Conformity, NHTSA authorizes the release of the entry bond. If NHTSA disapproves the Statement of Conformity, NHTSA recommends that penalties be imposed for noncompliance with federal safety standards.
(Stipulated Facts, at 4-6).
[3] Section 40-2-25.1 further provides:

(b) The provisions of subsection (a) of this Code section shall only apply to applications for certificates of registration for such motor vehicles first registered in Georgia after July 1, 1985. Certification of compliance shall only be required at the time of application for the issuance of the initial Georgia certificate of registration.
(c) Applications for registration of such motor vehicles shall be accompanied by a Georgia certificate of title, proof that an application for Georgia certificate of title has been properly submitted, or such other information and documentation of ownership as the commissioner shall deem proper.
O.C.G.A. § 40-2-25.1(b), (c) (1985).
[4] Section 40-3-29.1 continues:

(b) The provisions of subsection (a) of this Code section shall only apply to applications for certificates of title for such motor vehicles first titled in Georgia after July 1, 1985. Certification of compliance shall only be required at the time of application for the issuance of the initial Georgia certificate of title.
O.C.G.A. § 40-3-29.1(b) (1985).
[5] Section 16-9-110 provides:

(b) Any person convicted of violating subsection (a) of this Code shall be guilty of a misdemeanor.
O.C.G.A. § 16-9-110(b) (Supp.1986).
[6] Although defendants did not argue in court that plaintiffs lacked standing, the preliminary statement indicates that standing is an issue. The court finds that plaintiffs have standing. Plaintiff GAICA is an organization representing businesses involved in the direct import trade, including plaintiff German Connection, Ltd. These businesses claim that the Georgia statutes have caused them to lose income and profits. They have alleged a concrete injury, and have standing. GAICA, as their representative, also has standing to sue in their interest. Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977). Plaintiff Thomas Baker purchased a direct import vehicle. He attempted to procure Georgia certificates of registration and title. Because he did not have proof of compliance, he was denied the certificates. Thus, he has alleged a concrete injury. In sum, all plaintiffs have standing to bring this suit.
[7] New motor vehicle is defined, with respect to imported vehicles, as one which was manufactured after the effective date of regulations issued under the Clean Air Act which are applicable to the vehicle, or which would be if the vehicle were manufactured for importation into the United States. 42 U.S.C. § 7550(3) (1982).
[8] The Pennsylvania statute upon which the original suit revolved, 419 F.Supp. 688 (M.D.Pa. 1976), was repealed. The United States Court of Appeals for the Third Circuit vacated and remanded for consideration in light of the new statute. 558 F.2d 1028 (3d Cir.1977). The case discussed in text is the district court's invalidation of the second statute.
[9] Both sides cite Juvenile Products Manufacturers Ass'n v. Edmisten, 568 F.Supp. 714 (E.D.N.C. 1983). The North Carolina statute in question required child passenger restraint system manufacturers to submit test data and pay a fee. Id. at 716. The court found that the state statute required certification or approval, which the legislative history of the 1982 amendment precluded. Id. at 718. The court noted that the legislative history stressed that state and federal governments should work in harmony. Id. Additionally, the history indicated that no extra fees should be required of manufacturers. Id. at 719. Finally, the original amendment, proposed in 1982 but not passed, was much broader than the current language. Id. The court found that "[e]ven when states attempt to enforce standards identical to those existing at the federal level, they may not do so in any way which significantly burdens manufacturers of motor vehicle equipment." Id.

Although the Edmisten decision is thoughtful, it does not provide much guidance for the instant situation. It deals with a fee based regulation; which the Georgia statutes lack. The case also does not discuss pre and post sale requirements. Finally, it does not discuss the direct import market.
The court also has read Sims v. State of Florida, No. TCA 85-7214-WS (N.D.Fla. Dec. 30, 1985), [Available on WESTLAW, DCTU database], and Direct Automobile Imports Assn v. Townsley, No. H-85-3610 (S.D.Tex. Oct. 18, 1985) [Available on WESTLAW, DCTU database]. The court agrees with those courts that the Clean Air Act preempts state statutes such as those in issue in the instant case. The court disagrees with the courts' determination that MVSA preempts the statutes. The court respectfully declines to follow the Sims decision as it regards the Commerce Clause.
[10] The Commerce Clause limits the states' ability to regulate foreign commerce. The federal government is seized with that power to a greater degree. Japan Lines, Ltd. v. County of Los Angeles, 441 U.S. 434, 448, 99 S.Ct. 1813, 1821, 60 L.Ed.2d 336 (1979).
[11] Under the Commerce Clauses, Congress may legislate when it decides that independent state action does not advance the national welfare. Kassel, 450 U.S. at 669, 101 S.Ct. at 1315. The court's Commerce Clause analysis applies only where Congress has not specifically legislated away the states' right to act. If the CAA had not been preemptive of state action, the Commerce Clause analysis used in text would apply.

Additionally, plaintiffs claim that defendants could have accomplished their goal by less burdensome means. For example, the statutes could require submission of the same information that is given to DOT and EPA. Such a requirement, however, would not satisfy the statutes' purpose. The state wants proof that EPA and DOT have accepted the submissions and have given permission to sell and drive the cars. Such information will satisfy the state that the vehicles are safe and pollution free. This goal is legitimate. Plaintiffs' suggested less onerous alternative would not accomplish the state's goal and thus is unsatisfactory.